TIMOTHY FLAHERTY, ESQ. (BBO No. 557477)
FLAHERTY & FLAHERTY
43 Bowdoin St.
Boston, Massachusetts  02114
Telephone:  (612) 227-2186
Facsimile:  (617) 227-7777

THOMAS J. GRIFFIN, ESQ. (California Bar No. 141694)
NELSON ◇ GRIFFIN
555 West Fifth Street, Suite 320
Los Angeles, California 90013
Telephone:  (213) 833-0155
Facsimile:  (213) 833-0160

Attorneys for Defendant
COSTELLO'S TAVERN

*Nelson ◇ Griffin*
TRIAL ATTORNEYS

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS - EASTERN SECTION

| | |
|---|---|
| CHAPPELL & CO., INC., ET AL. | C.A. No. 1:05-CV-10143-NG |
| Plaintiff, | |
| v. | **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| COSTELLO'S TAVERN, INC. | |
| Defendant. | |

**I**.

**INTRODUCTION**

The basis of plaintiff's complaint, and more particularly this motion for summary judgment, is the contention that a rag-tag unnamed band made up of an assortment of unknown members consisting of music students, patrons and street musicians participated in the unlicenced performance of three (3) of plaintiff ASCAP's copyrighted songs.  The purported irrefutable evidenced offered in support of the motion is opposing counsel's interpretation or (misinterpretation) of the deposition testimony of professor James Merenda and the liquor store clerk turned investigator for ASCAP, Steven Furtado.  It was under auspices of professor Merenda that the Sunday Jazz-Jam was conducted.  Professor Merenda

1

is a professor of music at Northeastern University and the New England Conservatory of Music. He is indeed, unlike "investigator" Furtado, a professional musician and instructor.

The admissible evidence clearly establishes that genuine issues of material fact exist. There are serious issues as to the credibility of the moving party's witnesses. Both require determination by the trier-of-fact and are not appropriate for Summary Judgment Adjudication.

## II.

## PLAINTIFF HAS NOT MET THEIR BURDEN OF PROOF

Rule 56 requires the entry of judgment against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In determining whether the plaintiff's evidence has established a genuine issue of material fact, the appellate court <u>must view the evidence in the light most favorable to the non moving party and give them the benefit of all these inferences</u>. <u>Jackson v. Anchoring Packing Co. et al.,</u> 994 f2nd 1295, 1304  8th cir 1993).

Plaintiff ASCAP relies on the notion that defendant is unable to refute the evidence, as interpreted by plaintiff's counsel, is simply not true.

While ASCAP conducted its surreptitious "investigation" on the evening of August 15, 2004, they intentionally did not file their lawsuit until over five months later with service occurring six months post-alleged incident. Professor Merenda conducted his jazz-jam over the course of 4 ½ years. While counsel for ASCAP would like the court to make as much to do as he does about the witnesses and defendant's specific recollection of that Sunday evening, the actual relevant testimony of professor Merenda is:

1.    Professor Merenda is a private music instructor at Northeastern University (Merenda deposition, page 4, line 23-24 and page; 5, lines 1-6).

2.    Professor Merenda has a Bachelors of Arts (BA) from New England Conservatory of Music in Jazz Performance. (Merenda deposition page 5, line 18-19 Exhibit "F" to moving papers).

*Nelson ◊ Griffin*
TRIAL ATTORNEYS

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**

3.      Professor Merenda has been a freelance musician and teacher since 1991 with eleven years of experience as a private music instructor at the Brookline Music School (Merenda deposition page 6, lines 3-10).  His professional experience includes performing in several of his own bands with extensive experience in jazz performance. (Merenda deposition, page 7, line 19-24; page 8, line 1-20).  Professor Merenda began performing at Costello's 4 ½ years ago (Merenda deposition, page 10, line 18-19, page 16, line 2).

Professor Merenda's relevant testimony on  how the jazz-jam went was that music compositions played at Costello's were by way of improvision. "'Improvising' is creating music, and a lot of improvisors create based on already existing forms.  So I would really [sic: rarely].  I would probably more or less go into a song, to the next, and not necessarily even playing the melody or the right key but playing a reflection of that song and maybe going into another song.  And usually the people I was playing with, we would have a rapport, so we have been playing a lot together.  So that's the kind of description of what my first set would be." (Merenda deposition, page 126, line 2-12).

That entire evening went the same way:

Q. That's a method of performing that you just described.  And you would use that method with the same mix of songs, original songs, standards and contemporary?

A. Sure, absolutely.  That sounds somewhat accurate.

Q.  So some of the songs, the audience might well recognize it, the composition.  But some of the songs, they may well not recognize it and - - I'm not sure what contemporary, is what I just said, right?

A. Yeah.  Q. What do you mean by "contemporary" jazz that would distinguish it from either original or standard?

A.  A composition written by someone other then the people playing more recently, more likely in the last ten, twenty years.  Songs that aren't considered standard should be more obscure, while complicated in melody and harmony (Merenda deposition page 26, line 1-24; 27, 1-10).

///

3

C:\staging\4384F006-22BE-28289E\in\...

*Nelson ◇ Griffin*
TRIAL ATTORNEYS

To clarify the proceedings even further:

Q. I understand your testimony just recently that you would improvise when you played a standard?

A.    Correct.

Q.    Does that mean you play outside the structure of a song? Put another way, you would refer to a song during a jam and then would shift melody and harmony and chord to make the song more interesting and more original?

A.    That describes one of the ways I might have changed it. But there are many ways I would use a song as a basis but change many different aspects of it.

Q.    Am I fair in understanding the way that you would play as it was a free-flowing creative environment?

A.    Yeah.

(Merenda deposition, page 43; line 23-24, page 44, line 1-17).

The deposition testimony of professor Merenda goes on at length to describe how and when certain notes or musical combinations were utilized. Again, plaintiff attempts to use unsubstantiated "expert" testimony to support their position that copyrighted music was played or that Mr. Furtado is competent to offer anything other than his lay opinion. For example, Merenda's testimony continues:

Q. Was it your practice to take a recognizable song as a so called "jump-off point" and change it during the jazz jam?

A. Yes. That was one aspect of what we did.

Q. You did testify that at some point at Costello's you remember playing a song called "Star Dust" ?

A. Mm-hmm.

Q. In playing that song "Star Dust", would you use the song "Star Dust" as a jump-off point and play it as you described it earlier, modulating the harmony and chord?

A. Yes. I would rarely ever use the melody that was put to words.

Q. Is that the only song that you recall specifically using a jump-off point when you

4

are referring back to the list of songs that Mr. Young has read off to you?

A. That wasn't on the list, I believe.

Q. That was not on the list?

A. No.

Q. Of the list of songs that were read off to you by Mr. Young.

A. I don't recollect doing any others that were on the list in the same way or maybe even - - those songs might have been songs that might have been performed by people who were sitting in but, it wasn't I who performed it personally.

Q. Do you have any specific recollection of any of those songs being performed as a mirror image or specifically to the sheet music, as you understand the sheet music for any of those songs?

A. Not specifically, no.

The evidence or the reasonable inference of the evidence is that professor Merenda was indeed present on August 15, 2005.  The jazz-jam then continued for another six months until this lawsuit was filed.  ASCAP intentionally took the approach of allowing the passage of time so that witnesses' memories of an otherwise unremarkable night would fade, which is tantamount to asking someone what they  had for lunch six months ago and then insisting they prove a negative.

The simple fact is that the  professor conducted <u>his</u> jazz-jam as he did on any other Sunday over the roughly 4 ½ year period.

**III.**

**FURTADO'S TESTIMONY LACKS FOUNDATION AND IS INCOMPETENT**

Plaintiff offers the incompetent testimony of Steven C. Furtado in support of its contention that certain copyrighted songs were performed at defendant's establishment on August 15, 2004.  Plaintiff offers no evidence to establish a proper foundation for Mr. Furtado to offer testimony concerning this issue, and has thus clearly failed to meet its burden of proof.

///

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**

*Nelson ◊ Griffin*
TRIAL ATTORNEYS

*Federal Rule of Evidence* 701 states:

> If the witness is not testifying as an expert, the witness' testimony
> in the form of opinions or inferences is limited to those opinions
> or inferences which are rationally based on the perception of the
> witness <u>and</u> (b) helpful to a clear understanding of the witness'
> testimony or the determination of a fact in issue <u>and</u> not based
> on scientific, technical or other specialized knowledge within
> the scope of Rule 702.

Mr. Furtado has a degree in music performance with an emphasis in the "music business" (Furtado deposition, page 4, lines 7-8). Nowhere does plaintiff establish in what field of music Mr. Furtado has any particular relevant experience (e.g. jazz). Nothing about his previous academic curriculum is offered for the court's consideration, and no details whatsoever were mentioned about how much of his academic background was focused on this alleged emphasis in "music business". Just how his academic training in "music business" helped him to identify copyrighted songs on the night in question is unaddressed and of grave concern to responding party. The reality is that Mr. Furtado makes a living by managing a liquor store in New Bedford. This is his primary source of income. (Furtado deposition, page 27, lines 14-19).

Beyond his degree in music performance in an unspecified area, Mr. Furtado candidly admits that he has no additional training or education in the composition of music (Furtado deposition, page 4, line 17).

Furtado admits that he has never composed music (Furtado deposition, page 4, line 24). Although he claims to have been a member (but never a leader) of one band, (Furtado deposition, page 5, line 10), this band is of an unspecified type (rock, jazz, German "oom-pah-pah"?) and performs at only private functions of an unspecified nature. (Furtado deposition, page 5, line 15). Mr. Furtado could not even identify with any degree of certainty the last time this band performed. (Furtado deposition, page 5, line 23). His most recent "gig" was at a nursing home in Rhode Island. He was paid Sixty Dollars ($60.00) for

6

*Nelson ◇ Griffin*
TRIAL ATTORNEYS

his skills as a trumpeter to perform at a mixer at a home for the elderly. (Furtado deposition, page 6, lines 2-13).

ASCAP has offered no independent evidence whatsoever regarding any particular prior experience, testing, or skills required of individuals performing Mr. Furtado's job. Mr. Furtado himself candidly admits that he has received no investigative training whatsoever since being retained by ASCAP to investigate music licensing and/or copyright infringement activities on its behalf. (Furtado deposition, page 6, lines 15-16; page 9, lines 4-11). Throughout all of this, Furtado functions without a supervisor (Furtado deposition, page 9, line 13). Mr. Furtado was merely issued a packet of information (see attachment to deposition of Steven Furtado, plaintiff's Exhibit "D") and the assignment to "investigate" defendant's premises.

As for his knowledge of the songs allegedly played on the night in question at defendant's bar, Mr. Furtado admits that he did not recognize some of the songs played that night (Furtado deposition, page 18, line 12). This admission begs the question of just how many songs Mr. Furtado thinks that he recognized, but about which he was actually in error. Even then, he admits that he was assisted in recognizing some of the songs by his construction worker friend Scott Dupre. Plaintiff has not seen fit to favor the court with evidence of Mr. Dupre's background and professional training in the field of music and the fine arts.

In the investigator's report of "List of Musical Compositions Performed" there are twelve songs which were allegedly played. ASCAP claims copyrights to only three of them. The liquor store manager (i.e., investigator Furtado) admits that there were some songs that he did not recognize. (Furtado deposition, page 18, lines 10-12). He cannot recall specifically which of the twelve songs his drinking buddy Dupre assisted him in identifying (Furtado deposition, page 18, lines 18-22). Furtado thinks Dupre makes his living as a contractor doing estimates (Furtado deposition, page 16, lines 2-3). The foundation for Mr. Dupre's hearsay contribution is apparently the contention that he has a sound recording degree from UMass-Lowell (Furtado deposition, page 19, lines 22-24).

7

This court should refuse to accept Mr. Furtado's uncorroborated and unverified testimony about the copyrighted songs played in defendant's premises as a basis for granting plaintiff's motion for summary judgment. To do so would allow the Furtado-Dupre team to declare themselves the winner in their high-stakes "Name That Tune" contest in which his liquor store management position apparently qualifies him to act as the sole contestant, judge and jury.

At the risk of belaboring the point, Furtado is and always will be unqualified to offer the testimony that ASCAP wants this court to rely on in granting their motion for summary judgment. While he claims to have done approximately 15 prior investigations, ASCAP refuses to produce those reports in the course of discovery. He thinks he may have conducted one investigation in the eleven months that had passed since his assignment to find copyright infringements at Costello's on August 15, 2004. (Furtado deposition, page 27, lines 4-7). Prior to the August investigation, he claims to have done approximately 15-20 investigations on behalf of ASCAP, which would be roughly three a year over his six years of part-time employment as an investigator (Furtado deposition, page 7, lines 15-20).

Furtado admits that the musical compositions were varied and quite different from the original compositions. The exchange at his deposition on this issue went as follows:

Q. Were the songs that you listed in your investigator's report exact replicas of the original compositions of the songs listed?

A. No.

Q. How did they differ from the original compositions of the songs listed?

A. They differed in different ways, but some of them could have been just tempo changes, stylistic differences.

Q. Are you familiar with jazz?

A. Yes.

Q. Are you familiar with performing a song outside the structure of the song, that concept?

A. I'm not exactly sure what you mean.

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**

Q.  Are you familiar with the practice of musicians using a certain melody of a song as a jumping-off point in a jazz jam, so to speak?

A.  Sure.

Q.  Is that what occurred the night when you were in Costello's with respect to these songs?

A.  At some times that occurred.

Q.  Were any of the songs listed when they were performed on August 15, 2004, exact replicas of the original compositions?

A.  Most of these, I don't know the exact original recording.  A lot of them are just standards.

Q.  So it is your testimony that these songs that are standards were used in part by musicians during the jazz jam?

A.  The ones that I listed were all played as the head and/or the main chords and endings of songs.

Q.  But there were changes throughout the songs?

A.  Solos.

Q.  What do you mean by "solos"?

A.  Different musicians would play solos, play alone and <u>make things up</u> to play.

Q.  So they would improvise the music?

A.  Yes.

Q.  And they would change the song.

A.  Well, I don't know if you can call them complete songs.  It is the form – you know.

Q.  Let me ask you the question this way, Mr. Furtado:  When the solo pieces were being played, they were not being played in accordance with the original composition or structure of the song, right?

A.  No.  Solos are part of the structure.

Q.  Were the solos improvising as they went along?

A.  I believe most of them were.

Q.  What is your belief founded upon?

A.  I could be wrong.  Some of them could have solos that they wrote out and memorized them.

Q.  And the solos that you heard that night at Costello's in Jamaica Plain, those solos were not recognizable to you as part of the songs listed here in your investigator's report, right?

A.  Some were and some were not.

Q.  Do I understand this jazz jam to be some sort of creative exercise among musicians?

A.  I guess so.

(Furtado deposition, page 34, lines 3-24; page 35, lines 1-24; page 36, lines 1-23).

Mr. Furtado's testimony goes on ad nauseam to contradict not only himself but his report and create serious questions of fact as to not only what was played but how and what constitutes a song under copyright law.  ASCAP is attempting to create expert factual testimony from a liquor store clerk and is clearly improper for the purposes of being relied on for this motion.

Mr. Furtado's testimony as to what was played and how is a one hundred percent contradiction to the cited testimony of Professor Merenda and creates more than ample triable issues of material fact.  For instance, Furtado claims that there were twelve songs, and twelve songs only played at Costello's from 9:30 p.m. to 1:30 in the morning.  As inconceivable as it may sound, he and his crony recognize eleven out of twelve songs that were played.  All from a group of nameless, faceless musicians from local schools, bar patrons and those walking in off the streets.  His testimony is:

Q.  And there were about 15 or 17 people that did that that night?

A.  Something like that, yes.

Q.  And this went on for several hours, from 9:30 to 1:30 in the morning or so?

A.  Yes.

10

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**

Q.  And as people got up and began to play, were any of them playing the original music, that you knew?  Were there some songs you simply didn't recognize?

A.  There was at least one I didn't recognize.

Q.  And these 12 songs that you list here, these aren't the only songs that were played that night?

A.  I believe they were.

Q.  These are the only 12 songs that were played from 9:30 to 1:30 in the morning?

A.  I believe so.

Q.  How long were each of these songs?

A.  They varied.  They weren't long.  They were all – if I can remember correctly, they were all around ten minutes.  Mostly more.

Q.  The original composition of each one of these songs, none of them last ten minutes, right?

A.  That's not true.  Some of them could.  In recordings, people do all the time.

Q.  Is it fair to say that the solo portion when patrons at Costello's would join the jazz jam as it occurred that night, the reason why the songs were lasting ten minutes or thereabouts was because the solist was improvising and playing music as he decided to play that night?

A.  Not necessarily.  Sometimes every single person took a verse as a solo, so it expands into more verses than it would normally have.

Q.  Is it fair to say there was a change in the melody and there would be a change in the harmony and a change in the chord changes from the original composition of these songs as a soloist performed?

A.  Maybe.

Q.  The point is, Mr. Furtado, each of these 12 songs that you listed were not performed verbatim on August 15, 2004, correct?

A.  Verbatim of what?

Q.  Verbatim of the original composition of each of these songs.

A.  With solos they can't be if they are improvising.

Q.  That's what was occurring that night?

A.  There was some improvising.

### IV.

### A MOTION FOR SUMMARY JUDGMENT WILL BE DEFEATED BY SUBMITTING AFFIDAVITS TO RAISE ISSUES OF CREDIBILITY OF WITNESSES

Furtado changed his report at the insistence of his handler at ASCAP, Mary Ellen Chisolm.  He does not know why but believes it was because he "neglected to put in" relevant information ASCAP later deemed important.  (Furtado deposition, page 39, line 24; page 40, lines 1-15).  Another substantive change is Furtado's hearsay claim that "Costello's music is provided three nights a week with DJs on Friday and Saturday night and a jazz jam on Sunday night.  I obtained this information via a phone call I made to Costello's before the investigation."  Not only is the aspect of the Friday and Saturday night DJ refuted by the Declaration of Costello's proprietor Matthew T. Griffin, it too lacks foundation and is hearsay.  What phone number he allegedly called and who he spoke to are conspicuously absent and thus procedurally defective as well as seriously questioning the witness' and his handler's credibility.  Exhibit B to Matthew T. Griffin's Declaration also controverts the witness' credibility by ASCAP's own licensing personnel's letters.

In a similar fashion, the irrelevant Declaration of Douglas Jones is challenged.  The purported "composite Exhibit A" to the Declaration of Jones is <u>not</u> included in the paperwork received by defense counsel.  In fact, the Exhibit A to the Jones Declaration consists of nothing more than duplicates of the copyright registration history documents attached to the Declaration of Mary A. Jenkins and sheet music.  However, as for the contention that ASCAP representatives had <u>any</u> telephone conversations or personal visits with defendant's agents or employees is refuted by the Declaration of Matthew T. Griffin.  Matthew T. Griffin is the president and sole proprietor of Costello's Tavern, Inc.  There are no "agents".  The staff consists of part-time bartenders who have not authority to act as an "agent" of the

Nelson ◊ Griffin
TRIAL ATTORNEYS

establishment or its owner.  No one from ASCAP has ever spoken, let alone visited, personally with Mr. Griffin prior to this lawsuit.  Why this Declaration is even included as it goes merely to damages is further evidence of ASCAP's suspect motives and tactics.

While the mere claim that an affidavit is perjured is insufficient, where specific facts are alleged that if proven would call the credibility of the moving party's witnesses into doubt, summary judgment is improper.  The court does allow for affidavits to be submitted in opposition to a motion for summary judgment in order to raise the issue of credibility - doing so will defeat a motion for summary judgment.  *(Lodge Hall Music, Inc. v. Waco Wrangler Club*, 831 F.2d 77, 81 (5th Cir. 1987).

## V.

## THE MOVING PAPERS CASE CITATIONS DO NOT SUPPORT ITS MOTION FOR SUMMARY JUDGMENT

ASCAP relies on a series of cases to support its motion for summary judgment, but a close scrutiny of these cases reveals a critical difference with the case at bar -- the issue of determining whether the defendant had allowed the use of the individual copyrighted songs was not being decided by those courts at that time.

For example, in *Broadcast Music, Inc., v. Old Colonial Corp.*, 62 U.S.P.Q. 1685, 1687 (D. Mass. 2002), defendants did not respond to discovery requests, and they filed no opposition to the motion for summary judgment.  In *Marvin Music Co., v. B.H.C. Ltd. Partnership*, 830 F. Supp. 651 (D. Mass. 1993), the defendant conceded that the songs were publicly performed.  In *Cass County Music Company v. Vineyard Country Golf Corp.*, 605 F. Supp. 1536, (D. Mass. 1985), the defendant likewise admitted that the musical compositions were publicly performed.  In *Famous Music V. Bay State Harness Horse Racing and Breeding Association*, 423 F. Supp. 341 (1976), affirmed, 554 F. 2d, 1213 (1st Cir. 1977) the infringement was not disputed.

One case cited by plaintiff, however, does offer assistance to the court in helping it resolve the merits of plaintiff's motion for summary judgment, but not in a way that plaintiff would prefer.  In *Milene Music, Inc., v. Gotauco*, 551 F. Supp. 1288, (D.R.I. 1982), the

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**

*Nelson ◊ Griffin*
TRIAL ATTORNEYS

testimony of the ASCAP investigators was challenged because they were employees of ASCAP and were presumably biased.  The court dismissed this challenge, saying that the defendants had not "furnished any counter-affidavits, nor otherwise impugned nor cast a scintilla of reasonable doubt upon the veracity and-or contents of the affidavits."  In a footnote, the court further wrote, "The record is barren of any effort on the part of the defendants, during the pendency of these actions, to exercise their vaunted rights of cross-examination by deposition(s) of any of the ASCAP personnel."

Unlike in _Milene_, in the case at bar, defendant has exercised its right to cross-examine plaintiff's "star witness," Steven Furtado, and it is very clear from his deposition testimony that Mr. Furtado's knowledge, expertise, and qualifications have been found to be wanting, and his very right to offer testimony on critical issues in this regard is woefully lacking.

Furtado's bias and economic incentive to find infringement is also obvious.  He could spend his Sunday at a nursing home and make $60, or he could get an all expense paid trip - free beer and food included - to a happening establishment in Boston, make $250 and hear some great music.

///
///
///
///
///
///
///
///
///
///
///
///

14

Nelson ◇ Griffin
TRIAL ATTORNEYS

C:\staging\4384F006-22BE-28289E\in\

# VI.

## CONCLUSION

There are numerous serious issues of material fact as to liability to be determined at trial. Therefore, plaintiff is not entitled as a matter of law to partial summary judgment on liability. The request for injunctive relief is not warranted or substantiated by any of the moving papers. Defendant has requested an occasional use license from ASCAP and has been denied because of the pending litigation. Surely ASCAP does not contend that it owns all the songs and all the notes in the musical universe. In fact, there are several other music licensing organizations such as BMI and SESAC who compete with ASCAP for licensing rights.

DATED: November 23, 2005          NELSON ◇ GRIFFIN

By: /s/ THOMAS J. GRIFFIN
     THOMAS J. GRIFFIN,
     Attorneys for Defendant
     COSTELLO'S TAVERN, INC.

## CERTIFICATE OF SERVICE

I, Myrna Morales, hereby certify that on this 23rd day of November, 2005, I served the following document: **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** pursuant to Fed.R.Civ.P. 26(a)(1) and Local Rule 26.2(A) on the plaintiffs' counsel by mailing a copy thereof addressed to: Stephen S. Young, Esq., Holland & Knight, LLP, 10 St. James Avenue, Boston, MA 02116.

/s/ MYRNA MORALES
MYRNA MORALES

*Nelson ◇ Griffin*
TRIAL ATTORNEYS

C:\staging\4384F006-22BE-28289E\in\~d **DEFENDANT'S OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**