UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

C. A. No. 1:05-CV-10143-NG

| | |
|---|---|
| CHAPPELL & CO., INC., ET AL.,<br>Plaintiffs,<br><br>v.<br><br>COSTELLO'S TAVERN, INC.,<br>Defendant. | **PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY AND INJUNCTIVE RELIEF** |

Plaintiffs filed this copyright infringement suit to seek relief from defendant's infringing performances of plaintiffs' copyrights in three songs. They then filed a Motion for Partial Summary Judgment on Liability and for Injunctive Relief to narrow the issues for trial to damages, because there was no dispute as to plaintiffs' ownership of valid copyrights, and performance was established by the uncontradicted personal observation of an investigator who was present at defendant's establishment on the night of the infringing performances. Magistrate Judge Dein denied plaintiffs' motion, concluding that although the sworn testimony of the investigator is undisputed and the defendant offered no testimony or evidence to refute plaintiffs' eyewitness testimony, there nevertheless is a sufficient dispute about the credibility of the investigator to create a genuine issue of material fact requiring resolution by a jury. Plaintiffs object to three misstatements set forth in the Magistrate Judge's statement of facts because they are either inaccurate or incomplete, and to the five grounds on which the Magistrate Judge based her conclusion.

## I.    OBJECTIONS TO UNDERLYING FINDINGS OF FACT

A.    The Magistrate Judge found that the independent investigator, Steven Furtado ("Furtado"), had been engaged "to go to Costello's on August 15, 2004, a Sunday evening, and

to write down each song he heard during the evening's jazz jam." (Report, p. 4). In fact, it is undisputed that Furtado's engagement, as conveyed to him by plaintiffs' performing rights licensing organization, ASCAP, was much more general, and that he alone determined when to conduct the investigation:

> Q.    What were the directions you received?
>
> A.    My directions came in a packet . . . I have to go into the venue and look up what they tell me to look up in the packet and also write down all the songs that are played and the times.

(Furtado Depo, p. 9).

> Q.    Could you tell us your best recollection of the content of those e-mails [with respect to Costello's].
>
> A.    I believe that she just tells me that an investigation needs to be done, gives me the club's name and the address, and that she will tell me to find out when they have live music, and then I determine when to do the investigation.

(Furtado Depo., p. 11).

      B.    On the issue of Furtado's background and experience in recognizing songs, the Magistrate Judge inaccurately and incompletely described his background and experience as follows:

> Furtado is a 27-year-old graduate of the University of Massachusetts-Lowell with a degree in music business. His full-time employment is as a manager of a liquor store. Additionally, he is in a band and has performed between 15 and 20 ASCAP investigations in the last six years.

(Report, p. 4).

      Of particular importance is the erroneous statement that Furtado's degree was "in music business." In fact, as Furtado testified during his deposition, "my degree is in **<u>music</u>** **<u>performance</u>** with an emphasis in the music business." (Emphasis added). Although no particular educational background or experience is necessary to qualify someone to recognize

and make a list of songs he or she hears, a degree in music performance is much more helpful in performing such a task than a degree in music business.

Similarly, the Magistrate Judge's statement that "he is in a band" significantly understates Furtado's musical experience. In fact, the uncontested testimony is that he had played the trumpet since fourth grade (Furtado Depo., p. 4); had performed "in schools, concert halls and different bars, inns" as a member of a band named In the Mood (Furtado Depo., p. 5); and presently performs in the band at private functions and, in particular, weddings. (Furtado Depo., p. 5).

C.    On the central issue of performance, the Magistrate Judge stated that "Furtado was unable to identify each of the songs himself; his friend, Dupre, assisted in some of the song identification." (Report, p. 5). In fact, Furtado's uncontroverted testimony was that he alone identified the songs, while Mr. Dupre merely assisted in jogging Furtado's memory as to the titles to one or more of the songs:

> Q.    Would you tell us how [Dupre] assisted you?
>
> A.    He has really good knowledge of jazz music, so he helped me determine some of the songs' names.
>
> Q.    Is it your testimony, Sir, that some of the songs which appear on the list here in your investigator's report were not identified by you?
>
> A.    No. They were all identified by me. But we helped each other jog our memories, you know.

(Furtado Depo., p. 17)

> Q.    . . . [O]nce you wrote [a song] down on your own notes, were you satisfied that the song you had heard was the song that you wrote down?
>
> A.    Yes.
>
> Q.    And you recognized that song yourself?
>
> A.    Correct.

(Furtado Depo., p. 45).

## II.    OBJECTIONS TO THE MAGISTRATE JUDGE'S GROUNDS FOR RECOMMENDING DENIAL OF PLAINTIFFS' MOTION.

In discussing the shifting of the burden of proof from the plaintiffs, as the moving party, to the defendant – that is, once plaintiffs presented evidence of the undisputed material facts -- the Magistrate Judge correctly observed that where the credibility of the moving party's witness is being questioned, as here, "the non-moving party must allege supporting evidence to establish a genuine issue of material fact . . . [a] bare assertion that the opposing party's uncontroverted evidence might be disbelieved is insufficient." (Emphasis added) (Report, p. 7). Although accurately stating the requirement that an opposing party provide contrary evidence--not just contrary assertion--the Magistrate Judge went on to find disputed issues of fact regarding Furtado's credibility and his report despite the complete absence of any evidence to support such an attack on the investigator's credibility. Accordingly, the plaintiffs object to the Magistrate Judge's five bases for her conclusion as follows:

A.    The Magistrate Judge first found that there was a disputed issue as to whether Furtado's report was factually incorrect in stating that "Costello's had DJs on Friday and Saturday nights and a jazz jam on Sunday nights . . . ." (Report, p. 9). The basis for the Magistrate Judge's conclusion was that Furtado said he "obtained this information by calling Costello's," whereas defendant submitted Matthew Griffin's verified statement in which he stated that "the only scheduled entertainment in 2004 were the jazz jams, and that no employee of Costello's would have any reason to say differently." (Report, pp. 9-10). The sworn Declaration of Mr. Griffin, however, does not create a disputed issue of material fact because the statement in Furtado's report was not a statement of fact, but merely a recitation of what someone had told him. Furtado was not stating on his own personal knowledge what the club's

entertainment policy was. Therefore, Griffin's contrary comments did not constitute a basis for challenging Furtado's credibility or the accuracy of his report.

        B.      The Magistrate Judge next found that there was a disputed issue of fact regarding Furtado's "ability to actually recognize the songs played that evening." (Report, p. 10). The Magistrate Judge based that finding in part upon the testimony concerning Furtado's friend, Dupre, about whom the Magistrate Judge said there was "no evidence that [he] was qualified to identify the music," and who "helped identify some of the songs." (Report, p. 10). As noted above, however, contrary to the Magistrate Judge's statement about the absence of evidence of Dupre's qualifications to identify music, Furtado testified in his deposition that Dupre "has really good knowledge of jazz music." (Furtado Depo, p. 17). More importantly, Furtado's testimony was not that Dupre helped him identify the songs themselves;[1] rather, he testified that Dupre "helped me determine some of the songs' names." (Furtado Depo., p. 17). Furtado went on to testify when questioned about whether he was saying that some of the songs were not identified by him, "[N]o, they were all identified by me." (Furtado Depo., p. 17). The clear meaning of Furtado's testimony was that with a few of the songs, he knew the music but could not remember the titles of the songs, an experience most people have had at one time or another. A statement that Dupre helped jog his memory about a title to a song does not constitute evidence that Furtado was unable to identify music generally or that he did not identify the specific songs he testified that he heard during the night he was at Costello's.

        C.      Next, the Magistrate Judge concluded that a disputed issue of material fact was raised regarding Furtado's ability to identify songs because "Furtado's degree in music business, rather than in musical composition, his experience in a band playing the trumpet, and his full-

---

[1] Recognizing the songs themselves really was not difficult because the songs were sufficiently familiar that musicians, who had never played together, were able to agree upon a song to play after talking for a few minutes among themselves before playing. (Furtado Depo., p. 50).

time employment as a liquor store manager, do not qualify [him] to correctly identify live jazz music." (Report, p. 10). Not only are some of those statements wrong and others incomplete, but they also do not constitute "evidence" establishing a genuine issue of material fact; they are merely "bare assertions that the opposing party's controverted evidence might be disbelieved," which the Magistrate Judge conceded is insufficient to attack a witness's credibility. (Report, p. 7). The Magistrate Judge's reference to Furtado's having a "degree in music business" is just plain wrong. Rather, his degree was in "music performance with an emphasis in the music business." (Furtado Depo., p. 4). In addition, the Magistrate Judge's recitation omitted the facts that (1) Furtado had played the trumpet since he was in fourth grade; (2) he plays in a band which has played "in schools, concert halls and different bars, inns'," and (3) presently the band performs primarily at private functions and weddings. (Furtado Depo., p. 5). Accordingly, the Magistrate Judge's truncated recitation of Furtado's background in music is insufficient to raise a genuine issue of material fact regarding Furtado's ability to identify songs.

D.     The Magistrate Judge next refers to Furtado's not having been trained or supervised in identifying music as providing support for defendant's attack on his credibility. (Report, pp. 10-11). Such a bare assertion in no way constitutes evidence of an inability to identify music. There is no evidence of there being any specific training required to listen to music, recognize and recall the titles of songs heard, and then make a notation of the songs someone hears – a relatively easy task for someone like Furtado, who had been involved continuously in the field of music for approximately 20 years. During the course of his investigation at Costello's Furtado made a list of the songs he recognized and when he did not recognize a song, he so noted that fact on his contemporaneously prepared notes, and then on his report. (See Notes and Report, relevant pages attached to Furtado's Deposition, Ex. D to Plaintiffs' Motion for Partial Summary Judgment). A lack of any formal training in how to

perform these mundane tasks is not evidence sufficient to attack Furtado's ability to identify songs generally and the songs in suit specifically.

      E.      Finally, the Magistrate Judge concluded that because ASCAP's representative had asked Furtado after he submitted his original report to complete a supplemental report providing additional information, a fact finder could consider "that ASCAP was directly involved in determining the content of the investigator's report" when the fact finder was trying to determine plaintiffs' claims that their songs were played at Costello's that evening. (Report, p. 11). The uncontested evidence, however, is that ASCAP was not involved in determining the content of the report, but merely in seeing to it the report was complete in al respects. Thus, when Furtado was asked at his deposition why the ASCAP representative had asked him to add some information, his testimony was "those are things that should have been in the report. I just neglected to put in." (Furtado Depo., p. 40). A plain reading of the information contained in those two pages – none of which bears on the central issue of performance of plaintiffs' songs -- in no way constitutes "evidence" establishing a genuine issue of material fact as to the accuracy of Furtado's contemporaneous notes and report of the songs he heard.

## CONCLUSION

Based upon the objections set forth above, plaintiffs respectfully submit that any doubt as to Furtado's credibility—or performance of plaintiffs' songs—is purely conjectural. There is no evidence here sufficient to undermine the credibility of the only witness to testify as to what songs were actually performed on the night in question. As a result, there is no legitimate dispute on the central issue of whether the defendant performed plaintiffs' songs. Accordingly, plaintiffs respectfully request that, after making a *de novo* determination in accordance with Fed. R. Civ. P. 72(b), this Court reject the Magistrate Judge's Recommendation and enter summary

judgment for the plaintiffs on liability on the ground that there is no genuine issue of material

fact as to defendant's liability.[2]

> PLAINTIFFS, CHAPPELL & CO.,
> INC., ET AL.
>
> By their attorneys,
> HOLLAND & KNIGHT LLP
>
> By:    /s/ Stephen S. Young
> Stephen S. Young (BBO #538040)
> 10 St. James Avenue
> Boston, MA 02116
> (617) 573-5833
> stephen.young@hklaw.com

<u>CERTIFICATE OF SERVICE</u>

I, Stephen S. Young, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), via facsimile and first-class mail, and paper copies will be sent to those indicated as non-registered participants on March 13, 2006.

> /s/ Stephen S. Young
> Stephen S. Young

# 3626845_v2

---

[2] Plaintiffs are no longer seeking the entry of an injunction against future infringing activities at Costello's as defendant has entered into a license agreement with ASCAP.

1

Volume I
Pages 1 to 56
Exhibits:  1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN SECTION

- - - - - - - - - - - - - - - - - -x
                                   :
CHAPPELL & CO., INC., ET AL.,      :
          Plaintiffs,              :
                                   :
     vs.                           :    Civil Action No.
                                   :    1:05-CV-10143-NG
COSTELLO'S TAVERN, INC.,           :
          Defendant.               :
                                   :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF STEVEN C. FURTADO, a witness
called on behalf of the Defendant, taken pursuant to
the Federal Rules of Civil Procedure, before Daniel
P. Wolfe, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Holland & Knight
LLP, 10 St. James Avenue, Boston, Massachusetts, on
Thursday, July 21, 2005, commencing at 2:00 p.m.

PRESENT:

     Holland & Knight LLP
          (by Stephen S. Young, Esq.)
          10 St. James Avenue, Boston, MA 02116,
          for the Plaintiffs and the Deponent.

     Flaherty & Flaherty
          (by Timothy Flaherty, Esq.)
          43 Bowdoin Street, Boston, MA 02114,
          for the Defendant.

Also present:  Richard H. Reimer, Vice President
               Legal Services, ASCAP
               Matthew Griffin

4

```
 1      A.    About two years.

 2      Q.    With whom do you reside?

 3      A.    My fiancee.

 4      Q.    Could you give us your educational

 5   background beginning after high school.

 6      A.    I went to school at University of

 7   Massachusetts-Lowell, and my degree is in music

 8   performance with an emphasis in the music business.

 9      Q.    Any graduate school?

10      A.    No.

11      Q.    Other than your degree in music

12   performance -- and is it with an emphasis in

13   business?  Am I stating that correctly?

14      A.    Yes.

15      Q.    -- have you had any additional training or

16   education in the composition of music?

17      A.    No.

18      Q.    Do you perform any instruments?

19      A.    I play trumpet.

20      Q.    How many years have you been playing the

21   trumpet?

22      A.    Since fourth grade.

23      Q.    Have you ever composed music?

24      A.    No.
```

5

1      Q.    Have you ever performed in any venue?

2      A.    Yes.

3      Q.    Where have you performed?

4      A.    In schools, concert halls and different

5   bars, inns.

6      Q.    Ever been a member of a band?

7      A.    Yes.

8      Q.    What are the names of bands you have been a

9   member of?

10      A.    In The Mood.  That's it.

11      Q.    Is In the Mood still currently a performing

12   band?

13      A.    Yes.

14      Q.    Where do you presently perform?

15      A.    It's almost all private functions.

16   Weddings.

17      Q.    Are you the leader of the band?

18      A.    No.

19      Q.    Do you derive income from your performance

20   of compositions in In the Mood?

21      A.    Yes.

22      Q.    When is the last time you performed?

23      A.    I'm not sure.  Last month.

24      Q.    Do you remember the date you performed

9

1      A.    Yes.

2      Q.    Could you tell me what that is, please.

3      A.    She uses "ogscoob21@yahoo."

4      Q.    During your approximately six years of

5 conducting investigations for ASCAP, have you ever

6 been trained by any person or at the direction of

7 ASCAP?

8      A.    No.

9      Q.    Did you receive any type of training prior

10 to conducting the investigations on behalf of ASCAP?

11     A.    No.

12     Q.    Do you have a supervisor?

13     A.    No.

14     Q.    Prior to conducting your first

15 investigation for ASCAP, were you told what the goal

16 of the investigation was by any person from ASCAP?

17     A.    No.

18     Q.    What were the directions you received?

19     A.    My directions come in a packet, which is

20 the form you guys have, and I have to go into the

21 venue and look up what they tell me to look up in

22 the packet and also write down all the songs that

23 are played and the times.

24     Q.    I am going to show you a series of

11

Q.    Is there any communication from ASCAP other
than this packet that you -- other than this
document that you received in the packet?

A.    No.

Q.    For instance, is there a directive in any
form other than this packet that you received from
ASCAP indicating what it is you are to do during
your investigation at Costello's?

A.    Yes.  E-mail from Mary Ellen.  She will
tell me where she wants me to go.

Q.    Do you recall the contents of the e-mails
you received from Mary Ellen Chisolm with respect to
Costello's?

A.    More or less.

Q.    Could you tell us your best recollection of
the content of those e-mails.

A.    I believe she just tells me that an
investigation needs to be done, gives me the club's
name and the address.  And then she will tell me to
find out when they have live music, and then I
determine when to do the investigation.

Q.    Do you receive the e-mail prior to
receiving the packet?

A.    Yes.

17

1    shape, or form in your investigation at Costello's?

2        A.    Yes.

3        Q.    Would you tell us how he assisted you.

4        A.    He has really good knowledge of jazz music,

5    so he helped me determine some of the songs' names.

6        Q.    Is it your testimony, sir, that some of the

7    songs which appear in the list here in your

8    investigator's report were not identified by you?

9        A.    No.    They were all identified by me.    But

10    we helped each other jog our memories, you know.

11        Q.    So you discussed the music that was being

12    played at Costello's that night; is that fair to

13    say?

14        A.    Yes.

15        Q.    And between the two of you putting your

16    heads together, you decided there were certain songs

17    that were being played that constituted some sort of

18    copyright infringement?

19            MR. YOUNG:    Objection.

20        Q.    Well, did the two of you identify some

21    music that you believed to be in violation of ASCAP?

22            MR. YOUNG:    Objection.

23        A.    No.

24        Q.    You can answer the question.

40

1    Costello's for the events occurring on August 15,

2    2004, did Mary Ellen Chisolm ask you to add

3    anything?

4         A.    Yes.

5         Q.    Could you tell us what Mary Ellen Chisolm

6    asked you to add.

7         A.    The last two pages.

8         Q.    Do you know why she asked you to include

9    these last two pages?

10        A.    Not exactly.  Those are things that should

11   have been in the report I just neglected to put in.

12        Q.    After you spoke to Mary Ellen Chisolm and

13   she told you to add the last two pages of narrative,

14   did she also tell you to add whether or not anybody

15   was using any sheet music or a real book?

16        A.    I don't think so.

17        Q.    And she reviewed the investigator's report,

18   right?

19        A.    I believe so.

20        Q.    I may have already asked this, but you did

21   not create an audio recording of what occurred in

22   Costello's on August 15, 2004, right?

23        A.    I did not.

24        Q.    And you did not create a video recording of

45

1       A.    That's right.

2       Q.    Do you remember if the person you spoke to

3   was a male or a female?

4       A.    I don't remember.

5       Q.    You also said that when you made the

6   list -- actually, let me leave this open for you.

7   When you made the list of songs, you were assisted

8   by Mr. Dupre with some of them; is that right?

9       A.    Yes.

10      Q.    What do you mean by "assisted"?

11      A.    Well, sometimes I would hear a song and the

12  name just wouldn't come to me right away, and he

13  might have known it or he may have known who the

14  popular recording was done by.  That would trigger

15  my memory.

16      Q.    With any of those songs, once you wrote it

17  down on your own notes, were you satisfied that the

18  song you had heard was the song that you wrote down?

19      A.    Yes.

20      Q.    And you recognized that song yourself?

21      A.    Correct.

22      Q.    Just at some time you didn't recall the

23  title, needed something to trigger your recollection

24  of the title or didn't recall a performer and needed

50

1      Q.   You also said that a lot of these songs

2  that are on this list are standards.  What do you

3  mean by "standard"?

4      A.   I mean that they are played a lot and you

5  hear them a lot.

6      Q.   When one group of performers stopped

7  playing their song and there were some interchange

8  of people, either the whole group left and somebody

9  else came up or however it worked, how did the new

10 performers determine what songs to play, if you

11 know, or song to play?

12     A.   They would just kind of discuss among

13 themselves and then start playing.  From where I was

14 I couldn't hear what they were saying.

15     Q.   They just get up and talk among themselves

16 and then they'd start playing a song?

17     A.   That's right.

18     Q.   You said that there wasn't any long break

19 during the course of the evening you were there; is

20 that right?

21     A.   That's right.

22     Q.   But there were periods of break between

23 songs?

24     A.   That's right.